**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. _____

COURTNEY WENNERSTROM, an individual,

Plaintiff,

v.

THE BOARD OF COUNTY COMMISSIONERS OF THE CITY AND COUNTY OF DENVER, A local government entity,

Defendant.

---

**COMPLAINT WITH REQUEST FOR JURY TRIAL**

---

COMES NOW, the Plaintiff, Courtney Wennerstrom, by and through her attorney, Thomas H. Mitchiner, of Mitchiner Law, LLC, submits her Complaint and Request for Jury Trial against Defendant, the Board of County Commissioners of the City and County of Denver.

**Nature of the Case**

This is an employment discrimination case arising from the discriminatory treatment of Courtney Wennerstrom, a disabled female, by her employer, the City and County of Denver. The discriminatory practices, based on Wennerstrom's disability, include, but are not limited to discriminating against Wennerstrom concerning the terms and conditions of her employment, salary and duties, and ultimately terminating her.

This action asserts violations of the Americans with Disabilities Act of 1990, the American with Disabilities Amendments Act of 2008, as amended, 42 U.S.C. § 12101, et.

seq., and the Rehabilitation Act of 1973, as amended, 29 U.S.C. §§ 791 and 794, [collectively referenced as the ADA].

## Parties

1. Plaintiff, Courtney Wennerstrom [Wennerstrom], a disabled female, is a resident of the City and County of Denver, State of Colorado.

2. Defendant, the Board of County Commissioners of the City and County of Denver, conduct business in the City and County of Denver, State of Colorado, within the judicial district of the Court.

3. The Defendant is referenced herein as the "County."

4. The County employed Wennerstrom from on or about March 21, 2018 until on or about July 23, 2018.

5. For the first 90 days of her employment Wennerstrom was a probationary employee.

6. The initial resume Wennerstrom submitted to the County indicated that Wennerstrom had her PhD, when at the time she technically was a PhD all but dissertation [ABD].

7. Wennerstrom realized the error and prior to the County hiring her she reached out to them to inform them that she was a PhD ABD and not a PhD.

8. The position the County hired Wennerstrom for did not require her to have a PhD.

## Jurisdiction and Venue

9. Jurisdiction is asserted pursuant to 28 U.S.C. §§ 1331.

10. This is an action authorized and instituted pursuant to the ADA, 42 U.S.C. § 12117(a).

11. At all times in issue, Wennerstrom was an employee of County as defined by the ADA.

12. At all times in issue, County was an employer as defined by the ADA.

13. Wennerstrom as a qualified person with a disability is a member of the ADA's protected class.

14. All claims arose in the Judicial District of this Court. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(c).

## Administrative Procedures

15. Prior to filing this action, Wennerstrom timely, properly, and lawfully exhausted all required administrative prerequisites procedures and remedies.

16. On or about October 11, 2018, Wennerstrom filed a timely charge of ADA discrimination with the Colorado Civil Rights Division [CCRD] [CCRD Charge No. FE2019929099].

17. The CCRD jointly filed Wennerstrom's charge with the Equal Employment Opportunity Commission [EEOC] [EEOC Charge No. 32A-2019-00056].

18. On May 16, 2019 the CCRD issued Wennerstrom a Right to Sue Notice.

19. On August 20, 2019 the United States Department of Justice issued a Notice of Right to Sue Letter to Wennerstrom.

20. This civil action is timely and properly filed because it is filed within 90 days of the date of the Notice of Right to Sue Letter.

## Background

21. Wennerstrom worked in the Department of Animal Protection at the Denver Animal Shelter as a Community Organizer.

22. Wennerstrom worked on the County's Pets for Life Program.

23. The Pets for Life [PFL] program reaches out to underserved communities to offer free pet care resources, services and information.

24. The PFL incorporates strategic door-to-door outreach, builds a consistent community presence and uses an extensive follow-up process to build relationships and trust within a segment of the pet-owning population that has largely gone untouched by animal service providers.

25. The PFL employs a three-pronged methodology to address the systemic challenges people and pets living in poverty face:

   a. Direct Care - Delivers pet services and information;

   b. Mentorship and Training - Guides and supports local organizations in implementing community outreach programs;

   c. Policy and Enforcement Reform - Influences organizations to be focused more on pet owner support and less on punishment.

26. PFL sets guidelines and metrics to determine if a particular Community Organizer was being successful.

27. According to PFL a successful Community Organizer for the County would hold at least one vaccine clinic and spay and neuter 38 pets per month, build relationships with the community, bring in several new clients and their pets, and license all of the animals in their service area who receive surgery.

28. PFL also required that Community Organizers perform proactive work.

29. Proactive work requires the Community Organizer to walk through their service areas, going door to door to meet and recruit new clients.

30. Wennerstrom was successful in all of these areas.

31. This is evidenced in the numbers of surgeries she scheduled, the meaningful relationships she has painstakingly and thoughtfully built, and in the recently renewed funding of the program.

32. According to the feedback Wennerstrom received, she performed thorough outreach that yielded one of the best and most successful vaccine clinics the County ever had.

33. Wennerstrom was meeting and/or exceeding her required numbers for spaying and neutering pets, and along with the other focus area in Denver was second in the nation for the metrics set by Pets for Life.

34. The new position as a Community Organizer required Wennerstrom in the first few months to learn two new databases, map out the entire neighborhood of

Montbello, complete the majority of her comprehensive onboarding tasks, met or exceed all of her goals, and became an important member of both the Montbello and the Pets for Life communities.

35. The County received funding for Wennerstrom's Community Organizer work from Denver City Council, District 8, to work in partnership with the National Pet for Life organization.

36. Wennerstrom suffers from fibromyalgia.

37. Wennerstrom made Brown, Wolfe and her coworker, Emily Caldwell, aware of her illness.

38. Fibromyalgia is a disorder characterized by widespread musculoskeletal pain accompanied by fatigue, sleep, memory and mood issues – and is greatly exacerbated by intense heat.

39. Wennerstrom's Fibromyalgia requires her to see a doctor often, and to rest.

### General Allegations

40. Jill Brown [Brown] and Julian Wolfe [Wolfe] supervised Wennerstrom.

41. Wennerstrom worked in the Montbello neighborhood of Denver, CO.

42. The County was supposed to provide Wennerstrom with an office in Montbello.

43. The County never provided Wennerstrom and office in the Montbello neighborhood.

44. When out in the field Wennerstrom and had to work out of the conference room at the Arie P. Taylor building.

45. On June 19th, Wennerstrom informed Wolfe that because of her Fibromyalgia, she would need to alter her schedule on June 20th to receive treatment [Accommodation Request #1].

46. On June 28th, 2018 – shortly after learning the Wennerstrom made the accommodation request – Wolfe sent an email to Wennerstrom which stating an entirely new requirement for proactive hours.

47. Wolfe now asked Wennersrom to perform 16.3 hours of proactive work per week.

48. In the email, Wolfe asked Wennerstrom to explain any barriers she might face in meeting the newly changed proactive hour goals, because he would be on vacation and unable to have a conversation in person with her about the hours.

49. Wolfe then left for two weeks.

50. While Wolfe was out of work, Wennerstrom paid attention to the challenges she would have in meeting the 16.3 hours of proactive work per week goal.

51. When Wennerstrom realized that she would not yet meet these new requirements, she reached out to Brown, to explain to her the obstacles and to seek reasonable solutions for all parties.

52. Wennerstrom informed Brown that the barriers could easily be overcome with a few small accommodations for the extreme weather, such as not requiring 16.3

hours of proactive work during the extremely hot months and by providing her a little more time and help to get her office up and running [Accommodation Request #2].

53.     After a short discussion with Brown, Wennerstrom sent a follow-up email, citing the following obstacles to performing 16.3 hours of proactive outreach:

   a. Extreme heat in Denver during July of 2018, which exacerbated her Fibromyalgia;

   b. the extra work she had to perform during several back-to-back surgery weeks, without the normal support of her direct supervisor;

   c. the extra time she spent above and beyond her normal workload in transporting a client's dog – who had received a one-off pet retention grant and required 4 trips to a vet located 25 minutes away from Wennerstrom's regular service area;

   d. the fact that the van provided to Wennerstrom by County needed maintenance, which required transport and pick-up and drop-off; and

   e. the fact the conference room provided as an office in Montbello was not entirely up and running due to spotty WIFI access.

54.     Despite not being able to complete 16.3 hours of proactive in July during the heat, she assured Brown that:

   a. she could easily perform these hours in the future, when it was not so hot and when she had fewer one-off tasks that took up many hours of her workday; [Accommodation Request #3].

      b. she was still meeting the essential functions of her job and all of her other performance metrics (aside from the 16.3 hours) during the 8.5 hours of proactive she was averaging during the heat.

55. At this point, Brown sent a series of emails now demanding that Wennerstrom account for how she was using her time, insisting that she break down every single hour of her work week by tasks.

56. Other employees not of Wennerstrom's protected class were not required to provide Brown with a breakdown of each hour of work per week.

57. Wennerstrom did her best to explain her myriad of responsibilities and duties, which can include things such as learning new Spanish vocabulary relevant to her position, delivering food and supplies to clients, visiting the Colorado Pet Pantry, counseling clients whose animals are sick; discerning when to intervene when clients are unable (due to substance abuse, mental illness, or disabilities) to take care of their pets; building relationships with law enforcement and Animal Control Officers.

58. Wennerstrom explained that these duties are often difficult to quantify via numbers, although they are extremely important for the success of the program.

59. On July 19th – when Brown knew Wennerstrom was on her way to meet Caldwell to pick up her van from Fleet Maintenance; and fully aware that she was about to use Paid Time Off [PTO] hours for the first time since she began this position, Brown sent Wennerstrom an email and insisted that Wennerstrom immediately give her a summary of how and where her time was spent.

60. Wennerstrom promptly replied, explaining that she was on her way to meet Caldwell, and was not able to immediately give this email the attention it deserved.

61. Wennerstrom reiterated that her work is complex and varying, so that no two weeks are exactly the same.

62. Wennerstrom assured Brown that going forward, she would be happy to track her time in this manner, and politely requested that – due to the complexities of her position and the unusual flurry of one-off scenarios that had occurred during the past two weeks, including the intense heat – that they discuss everything in person. [Reasonable Accommodation #4].

63. On July 23rd, less than three weeks after her team became aware of her disability, made new requirements for proactive hours – hours that were significantly higher than those of her colleague, Caldwell, who was assigned only 10 proactive hours per week – and after a record-breaking heatwave, the County terminated Ms. Wennerstrom without a single conversation.

64. The County did so despite the fact that Ms. Wennerstrom's performance met or exceeded the essential functions of the job and the non-quantifiable but important duties required of a Community Organizer.

### First Claim for Relief
[Disability Discrimination]

65. The foregoing allegations are realleged and incorporated by reference.

66. The ADA makes it unlawful to "discriminate against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a).

67. The ADA prohibits the County from discriminating against Wennerstrom: (1) with respect to her compensation, terms, conditions, or privileges of employment, because of her disability and/or (2) by limiting, segregating, or classifying her in any way, which would deprive, or tend to deprive her of employment opportunities, or otherwise adversely affect her status as an employee, because of her disability.

68. Wennerstrom is a member of the ADA protected class.

69. Wennerstrom has a disability pursuant to the ADA. 42 U.S.C. § 12101(1)(A).

70. Wennerstrom has a physical or mental impairment that substantially limits one or more major life activities of such individual; 42 U.S.C. § 12101(2) (A).

71. Wennerstrom suffers from Fibromyalgia.

72. Wennerstrom's Fibromyalgia substantially impacts one or more major life activities, including performing manual tasks, thinking, concentrating and working. 42 U.S.C. § 12102(2)(B).

73. At all times at issue herein, Wennerstrom was a qualified individual under the ADA.

74. Wennerstrom is an individual who, with or without reasonable accommodation: (1) could perform the essential functions of the employment positions she held with the County. 42 U.S.C. § 12111(8); and (2) possesses the requisite skill, experience, education and other job-related requirements of the employment positions she held with the County.

75. The County engaged in unlawful, direct, and intentional disability discrimination against Wennerstrom because of her disability, and/or, Wennerstrom's

protected status as a qualified individual with a disability was a motivating factor in the County's discriminatory treatment of Wennerstrom and the County's decision to discharge Wennerstrom.

76. The County discriminated against Wennerstrom: (1) with respect to her compensation, terms, conditions, or privileges of employment, because of her disability; and/or (2) by limiting, segregating, or classifying her in any way, which would deprive, or tend to deprive her of employment opportunities, or otherwise adversely affect her status as an employee, because of her disability.

77. The County's unlawful, intentional disability discrimination was created, perpetrated, and/or tolerated by the County's officials and managers, all having specific knowledge, or reason to know, of the discriminatory actions set forth herein.

78. The County's treatment of Wennerstrom constitutes intentional, unlawful disability discrimination, in violation of the ADA.

**Second Claim for Relief**
[Disability Discrimination – Failure to Accommodate]

79. Wennerstrom incorporates and restates all allegations previously asserted in this Complaint as though fully incorporated herein.

80. The ADA prohibits the County from not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an employee, unless the County can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity. 42 U.S.C. § 12112 (b) (5)(A).

81. At all times material herein, Wennerstrom was a qualified person with a disability under the ADA.

82. The County knew of Wennerstrom's disabilities.

83. When Wennerstrom informed Wolfe of her Fibromyalgia and her need to vary her schedule [Accommodation Request #1] Wolfe increased the number of proactive hours she was required to perform.

84. Wennerstrom requested a second reasonable accommodation—that the County provide her with a little flexibility during the extremely hot months and that they give her time to set up her office. [Accommodation Request # 2].

85. The County ignored Wennerstrom's Accommodation Request # 2.

86. Wennerstrom requested a third reasonable accommodation - that the County provide her with a little flexibility during the extremely hot months and that they allow her to settle in and finish the one-off tasks that were taking up a majority of her day. [Accommodation Request # 3].

87. The County denied Wennerstrom's Accommodation Request # 3.

88. Wennerstrom requested a fourth reasonable accommodation – that she be allowed to talk to her Supervisors about the unique challenges she faced during the two weeks Wolfe was out on vacation, given the extreme heat and the number of one-off tasks she had to perform. [Accommodation Request # 4].

89. The County denied Wennerstrom's Accommodation Request #4.

90. The County denied Wennerstrom's reasonable accommodations in the

Accommodation Requests ### 1, 2, 3 and 4.

91. Wennerstrom could have performed the essential functions of every job to which she was assigned by County, if she had had been provided with the accommodations she requested. [Accommodation Requests ## 1, 2, 3 and 6].

92. Wennerstrom's Accommodation Requests ### 1,2,3 and 4 were reasonable.

93. The County unreasonably failed to provide Wennerstrom any other accommodation.

94. The County's refusal to provide the reasonable accommodations in issue to Wennerstrom, constitutes an intentional and unlawful violation of the ADA.

### Third Claim for Relief
[Disability Discrimination - Regarded as Disabled]

95. Wennerstrom incorporates and restates all allegations previously asserted in this Complaint as though fully incorporated herein.

96. The ADA makes it unlawful to "discriminate against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a).

97. The ADA's definition of disability and discrimination includes discrimination against a person based on the person being **regarded as** having a physical or mental impairment that substantially limits one or more major life activities of such individual. 42 U.S.C. § 12101(2) (A).

98. An individual meets the requirement of "being regarded as having such an impairment" if the individual establishes that she has been subjected to an action

prohibited by the ADA because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.

99. The County engaged in intentional, unlawful disability discrimination against Wennerstrom based on the County regarding Wennerstrom as having a physical or mental impairment that substantially limits one or more major life activities of such individual. 42 U.S.C. § 12101(2) (A).

### Fourth Claim for Relief
[Disability Discrimination – Record of Disability]

100. Wennerstrom incorporates and restates all allegations previously asserted in this Complaint as though fully incorporated herein.

101. The ADA makes it unlawful to "discriminate against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a).

102. The ADA's definition of disability and discrimination includes discrimination against a person based on the person's **record of** having a physical or mental impairment that substantially limits one or more major life activities of such individual. 42 U.S.C. § 12101(2) (A).

103. As previously set forth in this complaint, Wennerstrom has a record of mental and physical impairments which substantially impact one or more of her major life activities, including performing manual tasks, seeing, concentrating, thinking, communicating, and working. 42 U.S.C. § 12102(2)(B).

104. At all times at issue herein, Wennerstrom was a "qualified individual" under the ADA. Specifically, Wennerstrom was as an individual who, with or without

reasonable accommodation, could perform the essential functions of the employment positions she held with the County. 42 U.S.C. § 12111(8).

105. The County engaged in intentional, unlawful disability discrimination against Wennerstrom, including but not limited to discriminating against Wennerstrom based on her record of a disability.

### Request for Relief

WHEREFORE, the County's unlawful conduct directly caused Wennerstrom to suffer injuries, damages, and losses;

FURTHER, Wennerstrom respectfully requests this Court to enter judgment in her favor and against Defendant County on the claims in issue and award the following relief under the ADA, and all applicable laws:

A. To enter a judgment in favor of Wennerstrom and against County, finding the acts of the County constitute unlawful intentional discrimination in violation of the ADA;

B. To award Wennerstrom the remedies of damages for back pay, front pay, restored benefits, accommodations, actual monetary damages, loss of wages, salary, retirement contributions, all loss of income, and all loss of monetary damages to which she is entitled;

C. To award Wennerstrom compensatory damages for emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, future pecuniary losses, and other non-pecuniary losses, and all loss of compensatory damages to which she is entitled;

D. To award Wennerstrom attorney fees and costs;

E. To award Wennerstrom pre-judgment and post-judgment interest at the appropriate rate provided by law;

F. To direct County to take such affirmative relief steps as are necessary to ensure that the effects of County's unlawful employment practices are eliminated and do not continue to affect Wennerstrom's employment opportunities, and;

G. To award Wennerstrom all other legal and equitable relief, to which Wennerstrom is entitled pursuant to under any law, that this Court deems just, equitable, and proper.

## **JURY TRIAL REQUEST**

Pursuant to Fed. R. Civ. P. 38 (a) (b) (c), and all applicable laws providing for a right to trial by jury, Wennerstrom seeks a jury trial of all claims and issues in this action.

Respectfully submitted on November 18, 2019 by:

Mitchiner Law, LLC

/s/ Thomas H. Mitchiner
Thomas H. Mitchiner
Mitchiner Law, LLC
1888 N. Sherman St., Ste 200
Denver, CO 80203
Phone: 720-538-0371
tmitchiner@mitchinerlawllc.com
Attorney for Plaintiff Courtney Wennerstrom

Address of Plaintiff:

1260 Wabash St.
Denver, CO 80220